IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

UNITED STATES OF AMERICA

    *v.*

STEVEN MERLO,

    Defendant

Criminal Action No.
3:17-CR-640

### Government's Response to Motion to Enforce Plea Offer

The United States of America, by counsel, William P. Barr, Attorney General, Byung J. Pak, United States Attorney for the Northern District of Georgia, and Sandra E. Strippoli, Special Assistant United States Attorney for the District of South Carolina, files this response to Defendant's Motion to Enforce Plea Offer (Dkt. 563)(Under Seal)[1], and respectfully shows as follows:

### The Relevant Facts

On January 2, 2018, a federal grand jury in the District of South Carolina returned a Superseding Indictment newly charging both the Defendant and Christopher Daugherty with drug and money laundering charges in Counts 1 and 4. (Doc. 221).    On or about January 17, 2018, both Merlo and Daugherty were arrested. (Dkt. 265, 295).   Merlo entered a not guilty plea on February 20, 2018, and on March 13, 2018, the Court granted Mr. Sherman's application to appear *pro hac vice* and represent Merlo. (Dkt. 313, 325).  On May 1, 2018, Merlo and his

---

[1] The defense filed a motion to seal on the basis of having included details of cooperation in their pleading, which motion was granted.  The Government believes such matters are irrelevant and will not refer to such herein.

counsel Victor Sherman executed a proffer agreement in the form of a letter (hereafter "Proffer Agreement"), which is attached in its entirety as Exhibit E to the undersigned's attached sworn declaration (hereafter "Declaration").  On page 1 of the Proffer Agreement, it states as follows:

> The following constitutes the proffer agreement between the Attorneys for the Government and Steven Merlo, hereinafter referred to as "Client."

### PROFFER AGREEMENT

> The purpose of Client making a Proffer is to provide the Government with an opportunity to assess the value, extent, and truthfulness of Client's information about the criminal liability of Client and others.

> **THIS IS NOT A COOPERATION AGREEMENT.**   Client has agreed to provide the Government with statements and information, and to respond to questions so that the Government may evaluate Client's statements and other information in making prosecutive decisions.    By receiving Client's Proffer, the Government does not agree to make a motion for downward departure on the Client's behalf or to enter into a cooperation agreement, plea agreement, immunity or non-prosecutive agreement.  The Government makes no representation about the likelihood that any such agreement will be reached in connection with this Proffer.

Declaration, Exhibit E 001.

The final paragraph of the Proffer Agreement states this:

> The parties hereby agree that this Agreement contains the entire agreement of the parties; that this Agreement supersedes all prior promises, representations and statements of the parties; that this Agreement may be modified only in writing signed by all

2

parties; and that any and all other promises, representations and statements made prior to this Agreement are null and void.

Declaration, Exhibit E 005.

Below that, the Proffer Agreement states: "I AGREE AND ACCEPT THE TERMS OF THIS AGREEMENT." Id.   And right after that, defense counsel and Merlo each signed the Proffer Agreement and each dated it May 1, 2018. Id.  Later on May 1, 2018, Mr. Sherman emailed the original AUSA[2] the signed Proffer Agreement, stating only, "Enclosed please find the executed proffer letter. We will be seeing the agent on May 8 and 9. Thank you." Declaration, Exhibit F 004.  The contents of the Proffer Agreement (the Government does not agree to enter into … a plea agreement; any and all prior promises, representations or statements are null and void; and this is the entire agreement of the parties, etc.), that Mr. Sherman and Merlo signed the Proffer Agreement on May 1, 2018, and that Merlo was not debriefed until a week after the Proffer Agreement was signed, are not in dispute.

On June 4, 2018, Merlo sought a continuance of the June 5th Pretrial Conference based on voluminous and ongoing discovery and because "the defendant and the government are engaged in ongoing plea negotiations." (Dkt. 349). The U.S. Attorney's Office for the District of South Carolina was later recused from the case, and the undersigned was appointed as a Special Assistant United States Attorney to take over the matter.  Declaration, para. 2.  On July 5, 2018, the

---

[2] Throughout this Response, the Assistant United States Attorney from the District of South Carolina handling this matter prior to the undersigned is referred to as the original AUSA.

undersigned met with the prosecution team to discuss the matter and effect the handing of it over to the undersigned, and entered her notice of appearance in the case. Id. At this meeting, the original AUSA advised the undersigned that no plea offers had been made, and that all of the defendants were expected to enter guilty pleas. Id. The undersigned returned to Atlanta and set about to make plea offers, which were made based on consultations with the case agent. Id.

On August 30, 2018, the undersigned sent Merlo defense counsel Susan Williams an email with an attached written proposed plea agreement that are Exhibit A to the Declaration. Declaration, para 4, Exhibit A. The plea offer, in short, included a plea to both counts 1 and 4, a drug base offense level of 24, a firearm enhancement under USSG § 2D1.1(b)(1), standard cooperation provisions and the forfeiture of various items of property. Declaration, Exhibit A. On September 25, 2018, Mr. Sherman sent the undersigned a letter that is attached to the Declaration as Exhibit B. The letter includes seven pages of his arguments on why each of the seven firearms in Merlo's residence should not be the basis of a firearm enhancement, as well as why he should not have to enter a guilty plea to the money laundering conspiracy charged in Count 4. Declaration, para. 4, Exhibit B 001 – 007. Mr. Sherman ended the letter with this paragraph:

> When discussing this case with your predecessor, it was always the position of the Government that Mr. Merlo would give his full cooperation, be debriefed in California and plead guilty to Count 1 with a guideline Level 24 based on 100 to 400 kilos of marijuana. At no time was there ever a mention of pleading to Count 4 or that there would be a gun enhancement. It was on this basis that Mr. Merlo · agreed to .be debriefed. The agents conducting the interviews after 2 days of debriefing, stated at the conclusion that Mr. Merlo had been truthful. Therefore, I would respectfully request that a new plea

4

agreement be drawn consistent with my conversations with [the original AUSA] and in conformity with the facts that show Mr. Merlo is guilty only of Count 1 and that there are no enhancements applicable to his case. One last thought. [the original AUSA] and I also specifically discussed that after safety valve (assuming eligibility) Mr. Merlo's guidelines before any 5K or Booker considerations were 30-37 months which reinforces how I handled the case on behalf of my client and the understanding I had with the Government.

Declaration, Exhibit B 007.

While it was clear that Mr. Sherman did not agree with government's position on the firearm enhancement, it was also clear that he only claimed to have had "conversations" and "discuss[ions]" with the original AUSA, admitted they had not discussed whether the firearm enhancement applied, and did not claim to have had entered into a plea agreement with the original AUSA. For the six months following the initial plea offer, Mr. Sherman and the undersigned exchanged a large number of emails about the merits of the government's position on the firearm enhancement, the effect of the firearm enhancement on the availability of the safety valve (USSG § 5C1.2), and forfeiture matters, all without a contention by Mr. Sherman that he had a plea agreement with the original AUSA binding me on any of these matters. Declaration, para. 5. Many of these emails are attached to the Declaration as Exhibit C. On November 14, 2018, Mr. Sherman asked in an email, "what if the defendant just pleads to the conspiracy count without an agreement?" Declaration, Exhibit C 0011. He also said in an email on November 12, 2018, "Obviously we need more time to reach a settlement." Declaration, Exhibit C 009.

During the course of these ongoing many months of negotiations, the government sent modified proposed plea agreements that eliminated the need to

enter a plea to Count 4, required less property to be forfeited, and eventually which would have allowed Merlo to contend that the firearm enhancement was only applicable to him because of the foreseeable possession of a firearm during drug trafficking activities by co-defendant Smith, which if the Court agreed with that position (the Government did not, it was made clear), would enable Merlo to still be eligible for safety valve, if he met the remaining criteria. Declaration, para. 5. During these months of negotiations, the defense sought continuances of Pretrial Conferences scheduled for October 1 and December 11, 2018, both times citing ongoing plea negotiations and needing time to prepare for trial if the negotiations were unsuccessful. (Dkt. 411, 443).

On March 14, 2019, with yet another Pretrial Conference approaching, Mr. Sherman emailed the undersigned and said, "I assume you don't have any objection to another continuance while we finalize the agreement. I am meeting with Mr. Merlo and his son on Monday to go over everything." Declaration, Exhibit D 002. The undersigned responded as follows:

> I do not.
> You should know that I've been negotiating plea agreements with several people that's had me focusing on drug quantity. In looking at Mr. Merlo's agreement earlier today, it seems to me that level 24 would not be correct for his drug quantity, and I've been spending the last few hours reading reports concerning what drug quantity he'd be accountable for. I am likely about to change my position to level 26.

Id.

Mr. Sherman responded:

> The Ausa and I agreed to a 24 and on that basis we did the debriefing. You can't change it at this point. It was clearly

6

understood and we had an agreement. And you confirmed the amount in multiple emails since. I don't want to make any accusations but it's beginning to seem like bad faith. It seems you continue to move the goal post once I agree to something. I'm very upset.

Id.

The undersigned responded:

I sent the plea agreement in good faith, and I'm reconsidering in good faith, too. What I had noticed is that your client in the draft agreement is at the same drug quantity level as the Rye brothers, which is what seemed very off and caused me to start reading the reports. I'm trying to be fair to everybody and have them appropriately help accountable for what they did.

If you are saying that you and the AUSA who has been recused had an agreement on drug quantity, I hope you have that documented in an email or something.

Id. at 001.

And Mr. Sherman responded:

I'm sure I do. And he will certainly orally confirm and I'm prepared to so testify. There is no question about it. Otherwise where would you have gotten that figure from since day one. Every agreement has had that figure.

Id.

The undersigned also told Mr. Sherman:

For what it is worth, I am not acting in bad faith. I'm just learning the facts of the case better and changing positions accordingly. It had been my position that Carl Rye didn't qualify for a 5K. When I learned the facts better last week, I changed my opinion in his favor. When I learned the facts on drug quantity relating to your client better, I changed my opinion on that, too, just not in his favor.

7

Id. at 005.

On March 18, 2019, the undersigned withdrew the plea offer with a base offense level of 24 and replaced it with 26.  Declaration, Exhibit D 003.

In July 2019, the defense sent me a draft of the motion now at issue.  It made the original AUSA a potential fact witness, and on July 17, I sent him and our respective supervisors a copy of it.  Declaration, para. 8.  The next day, the original AUSA advised me by email that "I strongly refute the notion of any oral agreement."  Id.

## ARGUMENT AND CITATION OF AUTHORITIES

In the 4th Circuit and elsewhere, plea agreements and proffer agreements are treated as contracts.  E.g., United States v. Barefoot, 754 F.3d 226, 242-244 (4th Cir. 2014)(plea agreement); United States v. Gillion, 704 F.3d 284, 292 (4th Cir. 2012)(proffer agreement); United States v. Holley, 849 F. Supp. 622 (E.D.Va. 2012) (proffer letter).   Once such an agreement is entered into, each party must abide by the agreement, and each is entitled to the benefit of their bargain.  Barefoot, 754 F.3d at 240 ("[i]n construing the meaning of the [Plea] Agreement, we are guided by standard principles of contract law 'to ensure that each party gets the benefit of their bargain.'")  Where their meaning is disputed, the terms of plea agreements and proffer agreements, as well as what constitutes a breach, are

8

determined by application of the reasonable expectation test, which is an objective rather than a subjective test.   United States v. Scruggs, 356 F.3d 539, 543-544 (4th Cir. 2004)(contract law principles govern the standard for what constitutes a breach of a plea agreement, and dictate that the standard is based on the reasonable expectations of the parties, which is an   objective rather than a subjective standard).   Prosecutors are held to higher standards and when a provision in a plea agreement or proffer letter is ambiguous, it is construed against the government. E.g., United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986)(plea agreement);   United States v. Deatoni, 171 F.Supp. 477, 486-87 (E.D.Va. 2016)(proffer letter and plea agreement).

In United States v. Gillion, 704 F.3d. 284, 292 (4th Cir. 2012), the defendant had breached a proffer agreement, but contended that the proffer agreement expired upon an indictment being returned.   The Fourth Circuit applied contract principles:

> A proffer agreement "defines the obligations of the parties and is intended to protect the defendant against the use of his or her statements, particularly in those situations in which the defendant has revealed incriminating information and the proffer session does not mature into a plea agreement." *Lopez*, 219 F.3d at 345 n. 1. We interpret a proffer agreement based on the language it contains. *Id.* at 346–47. In sum, a proffer agreement operates like a contract; accordingly, we examine its express terms to determine whether the defendant is in breach. *See United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991) (holding that proffer agreements are interpreted like contracts); *United States v. Chiu,* 109 F.3d 624, 625 (9th Cir.1997) (same).

Id. at 292.  Because the agreement did not suggest any temporal limitation,
and in fact, contemplated a trial where the proffer agreement had been
breached, the Court rejected the defendant's argument.  Id.

      In United States v. Holley, 849 F. Supp. 622, 624-627 (E.D. Va. 2012), the
Court addressed a situation where a defendant not represented by counsel
executed a proffer letter.  The defendant later contended that he had been granted
transactional immunity, but the proffer letter did not provide that.  Id. at 627.  The
Court considered whether an implied contract could have existed, and noted that
the defendant had the burden to "show 'at least a meeting of the minds' that the
government would not prosecute him in exchange for his cooperation."  Id.  at
627-28.  The Court stated:

> Overall, the facts here are similar to *United States v. McClung*,
> No. 98–4587, 1999 WL 635644, 1999 U.S.App. LEXIS 19946 (4th Cir.
> Aug. 20, 1999) (unpublished per curiam).  McClung claimed the
> government had agreed not to prosecute him in exchange for
> cooperation with a drug task force; the district court heard evidence
> that a meeting had taken place between the defendant and the
> charging authorities at which it was discussed that McClung's
> cooperation could be exchanged for federal charges not being filed.
> *Id. at *1–2, 1999 U.S.App. LEXIS 19946 at *4. McClung subsequently
> signed a proffer letter at a later meeting, which granted him only limited
> use immunity. Id. The court held that the "terms of the proffer letter are
> patently inconsistent with an extrinsic, oral agreement not to prosecute,"
> and therefore no agreement existed. Id.* at *2, 1999 U.S.App. LEXIS 19946
> at *5.

> Here, as in *McClung,* the testimony presented is insufficient to meet the defendant's burden of showing that an oral agreement for transactional immunity existed.

Id. at 628 (emphasis supplied).

The Court in Holley found that the defendant's testimony about an alleged oral agreement or "meeting of the minds" on transactional immunity "stands in stark contradiction to the terms of the proffer letter and the other evidence before the Court." Id. at 629.  It concluded that such evidence when countered by the proffer letter "did not nearly meet his burden."  Id.  The proffer letter in Holley contained language similar to the one here as far as ruling out other promises, understandings or agreements between the parties other than what was in the agreement, as well as that the agreement could only be modified in writing. Id. at 626.  Such language is often referred to as an integration clause.  Barefoot, 734 F.3d at 242.

In United States v. Barefoot, 734 F.3d 226 (4th Cir. 2014), the Fourth Circuit dealt with an integration clause in the context of a plea agreement, where the defendant contended that he should have transactional immunity rather than the use immunity set out in the plea agreement. Barefoot contended that, near the beginning of the negotiations, the lead prosecutor represented that Barefoot would "get a walk" for any criminal activity he admitted during the debriefing.  Id. at 242.   He further contended that in a later phone conversation between counsel,

his lawyer was told that Barefoot would get one opportunity to tell all and would

not be prosecuted on anything he talked about. Id. Finally, at the debriefing the

following month, the agents allegedly urged Barefoot "to tell them everything he

knew" about any explosives or bombs, because, in light of the Plea Agreement,

"telling them where the bomb is cannot hurt him anymore." Id. Barefoot

subsequently entered into a Plea Agreement which contained an integration

clause:

> Immediately following the recitals, the Plea Agreement's initial
> numbered paragraph sets forth what is commonly referred to as a
> merger or integration clause. *See Restatement (Second) of Contracts* §
> 209 (1981) (hereinafter "*Restatement* ") (defining an "integrated
> agreement" as "a writing or writings constituting a final expression
> of one or more terms of an agreement"). Just as we would honor an
> integration clause to a contract, we honor one in a plea agreement.
> *See, e.g., United States v. Fentress,* 792 F.2d 461, 464 (4th Cir.1986)
> ("[A] fully integrated [plea] agreement ... may not be supplemented
> with unmentioned terms."); *see also United States v. Hunt,* 205 F.3d
> 931, 935 (6th Cir.2000) ("An integration clause normally prevents a
> criminal defendant, who has entered into a plea agreement, from
> asserting that the government made oral promises to him not
> contained in the plea agreement itself."). The integration clause in
> this instance specifies that "[t]his Memorandum constitutes the full
> and complete record of the Plea Agreement. There are no other
> agreements between the parties in addition to or different from the
> terms herein." Plea Agreement ¶ 1. Insofar as we are bound to give
> it force and effect, the clause precludes an interpretation of the
> Agreement that takes into account any preliminary oral
> representations inconsistent with its written form, because "[a]n
> integrated agreement supersedes contrary prior statements."
> *Restatement* § 209 cmt. a.

Id.

The Court noted that in determining the terms of disputed plea agreements, the standard rules of contract construction "may require ... tempering in particular cases" to take into account that "the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law." Id. at 243 (quoting United States v. Harvey, 791 F.3d 294, 300 (4th Cir. 1986). In addition, the Court stated that notwithstanding that, private law standards for interpretation of contracts alone can be entirely controlling. Id. After distinguishing two other Fourth Circuit cases dealing with disputes over terms in a plea agreement, the Court rejected the attempt to modify the plea agreement to include transactional immunity, based on the integration clause:

> The facts before us, by contrast, illustrate the more common situation that integration clauses are specifically designed to avoid. The most that can be gleaned from the record in the matter at bar is that the government twice expressed a certain amenability to granting Barefoot transactional immunity in exchange for complete and truthful revelations, but on occasions a full seven and five weeks, respectively, before the Plea Agreement was signed. There is simply no evidence of the government's position on immunity at any time proximate to the execution of the Plea Agreement except, of course, the written terms of the integrated Agreement itself. _Harvey_ counsels that "[p]rivate law interpretive principles may be wholly dispositive in an appropriate case," 791 F.2d at 300, and, lacking sufficient analogy to the facts of _Garcia_, the dispute underlying the Plea Agreement is appropriately resolved without resort to equity.

Id. at 244.

13

In <u>United States v. Leach</u>, 562 F.3d 930, 935 (8th Cir. 2009), the Eighth Circuit discussed both integration clauses generally, and integration clauses and their impact in the context of alleged oral promises made both before and after the written integration clause is entered into.   It stated that integration clauses typically prevent a defendant from claiming that the government beforehand made oral promises not in the plea agreement itself. <u>Id.</u>   Further, the Court noted that alleged oral agreements made *after* the entry of the written agreement cannot serve as part of the inducement for entering into the written plea agreement. <u>Id.</u> at 936.  This highlights that in this case, where Merlo and Mr. Sherman signed the Proffer Agreement a week before Merlo was debriefed, any alleged oral promise prior to the debriefing cannot be said to have induced the defendant to debrief, and that any alleged oral promise after the debriefing cannot have been an inducement for the debriefing.  And since the integration clause signed off on by Mr. Sherman and Merlo here stated that any modification of the agreement had to be in writing and signed by the parties, any alleged oral promise made between the defense's execution of the Proffer Agreement and the debriefing likewise cannot be considered to have induced the defendant to be debriefed.

As has been brought to the Court's attention, in an unpublished Report and Recommendation, United States Magistrate Judge Gossett cited  South Carolina Supreme Court case  <u>Custodio v. State</u>, 373 S.C. 4 (2007).    <u>Littlejohn v. Warden of</u>

Tyger River Corr. Inst., No. 110889-RMG-PJG, 2012 WL 195821 at 7 (D.S.C. May 30, 2012).    In Littlejohn, the matter before the Court was a motion for summary judgement by the state on a writ of habeas corpus petition where the petitioner asserted that his attorney provided ineffective assistance of counsel by not informing him that a plea offer had an expiration date.  The Court recommended that the motion for summary judgment be granted.

Custodio is part of a line of South Carolina cases that established and have confirmed several tenets in South Carolina law.  The first of them is that defendants do not have a constitutional right to plea bargain, a trial judge is not required to accept a plea bargain, and that ordinarily a plea offer is nothing more than an offer until it is accepted by the defendant entering a court-approved plea of guilty.  Custodio, 373 S.C. at 38-39   Another is that "[e]ven if the agreement has not been finalized by the court, a defendant's detrimental reliance on a prosecutorial promise in plea bargaining may make a plea agreement binding. Id. at 39 (quoting Reed c. Becka, 373 S.C. 676, 688 (1999).   However, under this line of cases, there actually has to be a plea deal in place at the time of the detrimental reliance:

> [A] defendant may not attempt to create a firm commitment out of plea negotiations. *State v. Whipple,* 324 S.C. 43, 49, 476 S.E.2d 683, 687 (1996). The State is not bound to accept a defendant's terms simply because a defendant reveals otherwise undiscoverable facts in the hope of securing a favorable plea agreement. *Id.;* *390 *State v. Thompson,* 278 S.C. 1, 292 S.E.2d 581 (1982), *cert. denied,* 456 U.S. 938,

102 S.Ct. 1996, 72 L.Ed.2d 458 (1982) (holding solicitor's plea negotiations to consider life sentence did not prevent State from seeking death penalty) *overruled in part on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

In *Whipple,* the court concluded no plea agreement was reached when a solicitor told Whipple he would consider, not promise, a life sentence if substantial mitigating evidence was demonstrated. 324 S.C. at 48, 476 S.E.2d at 686. Contrastively, in *Custodio,* all of the evidence presented conclusively showed that an agreement between the defendant and solicitor existed. 373 S.C. at 10, 644 S.E.2d at 38. The court ruled Custodio fully cooperated by providing helpful information in reliance on the solicitor's assurances of a fifteen-year sentence cap and was therefore entitled to have the agreement enforced. *Id.* at 12, 644 S.E.2d at 39.

State v. Miller, 375 S.C. 370, 389-90 (2008).   It also follows that under these cases, that a plea offer that has not been both accepted and entered in Court, or justifiably detrimentally relied upon, may be withdrawn at will.   Under this line of cases, even if the original AUSA said everything Mr. Sherman has claimed or may claim in the future was said prior to his execution of the Proffer Agreement, if nothing else, the original AUSA's sending the defense the Proffer Agreement was a valid and crystal clear withdrawal of any such promises, which occurred a week prior to the alleged detrimental reliance, and which withdrawal Mr. Sherman and Merlo acknowledged notice of when they executed the Proffer Agreement and sent it back to the original AUSA.   What's more, the Proffer Agreement plainly prohibited reliance on *any* future alleged oral promises, whether before or after the planned debriefing.

16

Whether Merlo was truthful is not relevant to the issue before the Court.   Nor is whether any of his information has borne fruit for him as far as substantial assistance.  None of that occurred prior to the defense executing the proffer letter. No person, especially not an experienced defense attorney, could have reasonably believed that there was an oral plea agreement in place having agreed to and accepted the terms of the Proffer Agreement.  See United States v. Moore, 931 F.3d 245, 250 (4th Cir. 1991)(where the plea agreement prevented the prosecutor from making a specific sentence recommendation, and the defense contended that the prosecutor's sentencing request for a severe sentence violated the spirit of the agreement, the Court found that there was no reason not to interpret the agreement literally because the defendant had experienced counsel, and thus rejected the claim).

There are two general purposes of integration clauses in proffer agreements and plea agreements.  The first purpose is to make sure everyone is on the same page as far as what agreements are and are not in place prior to a defendant taking the important and consequential steps of either entering into a guilty plea agreement or being debriefed.  The second purpose is to prevent the Court's and the prosecutors' offices resources from being spent litigating motions based on alleged oral agreements.  Where plea and proffer agreements are in plain enough language and unambiguous, they must be enforced, and when a defendant

attempts to obtain a benefit entirely contrary to the agreement he entered into, the attempt must be rejected.  There are more than sufficient facts in the record that are not subject to dispute to establish that the Defendant cannot meet his burden of proof.  From Victor Sherman's letter of September 25, 2018 asserting only "conversations" and "discuss[ions]" with the original AUSA; to over six months of intense negotiations in a so far unsuccessful attempt to reach a plea agreement with the undersigned without contending that there was already a plea agreement in place that the undersigned was required to enter in Court; to citing ongoing plea negotiations in several motions to continue pretrial conferences, and in two instances, asserting that if the plea negotiations were unsuccessful, time would be needed to prepare for trial, all after the alleged agreement was supposed to have already come into existence, and all confirming what is already apparent from the Proffer Agreement itself – there was no oral plea agreement.  The parties agreed that there were no oral pre-existing agreements and that there would be no oral agreements in the future.   And the terms of the Proffer Agreement, execution by Mr. Sherman and Merlo of the Proffer Agreement, and the timing of their executing the Proffer Agreement a week prior to the debriefing, are not in dispute. Never in this case did the parties enter into a plea agreement that the Court could enforce, and it must deny the motion.

This Court must reject any invitation from the defense to participate in plea negotiations.    United States v, Davila, 569 U.S. 597, 600 (2013).  Similarly, the motion before this Court does not concern the merits of the parties contentions on what sentencing guidelines adjustments apply and the Court cannot make such decisions until sentencing.  This is a defendant alleging the existence of a contract, which he has the burden to prove.   The Court cannot write the plea agreement for the parties.  As no plea agreement has been entered into, the parties must continue to attempt to reach one on their own.  As the defense advised the Court multiple times in continuance motions, if those ongoing negotiations are not successful, the parties will need to prepare for trial.

## Conclusion

WHEREFORE, the United States respectfully requests that the Court DENY
defendant Merlo's Motion to Enforce the Plea without an evidentiary hearing, as
more than sufficient uncontested facts in the record establish that the Defendant
cannot meet his burden of proof.

Respectfully submitted, this 17th day of September, 2019.

WILLIAM P. BARR
ATTORNEY GENERAL


BYUNG J, PAK
UNITED STATES ATTORNEY


s/Sandra E. Strippoli
SANDRA E. STRIPPOLI
SPECIAL ASSISTANT UNITED ATTORNEY
Georgia Bar No. 688565
75 Ted Turner Drive, SW,  Suite 600
Atlanta, Georgia 30303
404-581-6200
Sandy.Strippoli@usdoj.gov

## DECLARATION OF SANDRA E. STRIPPOLI

I, Sandra E. Strippoli, state the following under penalty of perjury:

1. From July 1991 to the present, I have been employed as an Assistant United
   States Attorney in the United States Attorney's Office for the Northern District
   of Georgia in the Criminal Division.  I am currently also a Special Assistant
   United States Attorney for the District of South Carolina for the purpose of
   representing the United States in United States v. James Dennis Smith, Jr, et al,
   case number 3:17-CR-640.

2. On July 5, 2018, because of a recusal by the U.S. Attorney's Offices for the
   District of South Carolina, I met with the prosecution team on that matter at the
   U.S. Attorney's offices in Columbia, South Carolina, to discuss the case and
   have it handed over to me to prosecute.  At that meeting, the original AUSA
   handling the case up to that time advised me that all of the defendants were
   expected to enter guilty pleas, and that no plea offers had been made.  I also
   entered my appearance in the case on that date.

3. After returning to Atlanta, I consulted with the case agent and worked with a
   forfeiture attorney (who had also been made a SAUSA) to prepare proposed
   plea agreements and preliminary orders of forfeiture for each of the defendants
   in the case.  For many of the terms of the plea agreements, I relied on the

assistance of the case agent, as my knowledge of the case was not extensive at that time.  I used some sample plea agreements provided by the original AUSA's office.

4. Attached as Exhibit A to this Declaration is an email I sent on August 30, 2018, to Merlo defense attorney Susan Williams, attaching the proposed plea agreement for Merlo.   Less than a month later, I received, via both email and mail, a letter from Merlo defense attorney Victor Sherman which is attached to this Declaration as Exhibit B.   The vast majority of the letter concerns his arguments on why none of the seven firearms in Mr. Merlo's residence triggered application of the USSG 2D1.1(b)(1) firearm enhancement, and why Merlo should not have to enter a plea to Count 4, the money laundering conspiracy.  Mr. Sherman in the letter did not assert that he and the original AUSA had entered into a plea agreement.  To the contrary, Mr. Sherman said that he had discussions and conversations with the original AUSA, and requested I draft a new plea agreement to track conversations Mr. Sherman said had taken place.  Having been advised by the original AUSA that no plea offers had been made, and given that the letter claimed only discussions and conversations, I ignored Mr. Sherman's request.

5. Mr. Sherman and I negotiated the terms of a possible plea agreement for over

   six months from the date of the initial plea offer.   Copies of some of the more

   pertinent email exchanges between Mr. Sherman and myself during this six

   month period following my initial plea proposal are attached as Exhibit C.

   During that period, we were intensely negotiating a plea, and our negotiations

   were inconsistent with a plea agreement of any kind already being in existence.

   We exchanged case law and argued the facts on the firearm enhancement,

   discussed its impact on the availability of the safety valve under USSG § 5C1.2,

   discussed my initial proposal that a plea agreement include a plea to Count 4 of

   the Superseding Indictment, and addressed forfeiture issues.  Those six months

   of emails occurred without any contention by Mr. Sherman that there already

   was a plea agreement he had made with the original AUSA that I was bound to

   agree to and enter in Court.  Also during that time, I sent Mr. Sherman multiple

   revised plea offers that eliminated the need to plead guilty to Count 4 and

   required the forfeiture of less property.  The Government eventually also

   offered to change the firearm enhancement provision to allow the defendant to

   contend that he should only receive it on the basis of the known or foreseeable

   possession of a firearm by a co-conspirator, and thereby possibly get safety

   valve if the Court agreed and he met the other criteria.  While doing so, I made

it clear that the Government would contend that Merlo's possession of firearms also justified the enhancement.   On November 14, 2018, Mr. Sherman asked in an email, "what if the defendant just pleads to the conspiracy count without an agreement?"  Exhibit C  0011.  He also said in an email on November 12, 2018, "Obviously we need more time to reach a settlement."    Exhibit C 0009.   Mr. Sherman never advised me that his client was willing to enter into any of my proposed plea agreements.  Until March of 2019, all of my plea proposals did in fact include a base offense level of 24 for the drug quantity under USSG § 2D1.1, which I had gotten from the case agent back in the summer of 2018.

6. As I was preparing for the March 19, 2019, Pretrial Conference, I was reviewing the reports of the debriefings of Bryon Rye, Carl Rye and James Smith in connection with trying to reach plea agreements with several defendants, including Mr. Merlo.   The Bryon Rye and James Smith reports were relevant to Mr. Merlo because Mr. Sherman was claiming that it was not factually true that it had been known or foreseeable to Merlo that Smith carried firearms while transporting marijuana for him.  During the course of reviewing these reports, all of which were of debriefings prior to Mr. Merlo's arrest, I became concerned that the base offense level of 24 that I had been including in the plea agreements for Mr. Merlo was too low, and especially so given that had

4

Carl Rye's estimated base offense level was also 24. I received an email from Mr. Sherman on March 14, 2019. That email and ones that followed in the next several days are Exhibit D. The email stated, "I assume you don't have any objection to another continuance while we finalize the plea agreement." Exhibit D 002.   I responded by advising Mr. Sherman that I consented. Exhibit D 002.   I then continued on to explain that I had been negotiating plea agreements and focusing on drug quantity, and expressed that I was thinking that a base offense level of 24 was not correct for Merlo and that I was "likely about to change my position."   Exhibit D 002. That precipitated a flurry of emails concerning this development, and I did on March 18 in fact withdraw the plea offer that had been pending and later replaced it with a possible plea agreement for Mr. Merlo to consider that included a base offense level of 26 for drug quantity and some forfeiture provision changes.   Exhibit D 001 – 007.

7. I then obtained a copy of the proffer agreement for Mr. Merlo, a copy of which is attached as Exhibit E, from the case agent. I had been familiar in general with the proffer agreements used by the original AUSA because I had been I possession of such agreements with co-defendants.

8. In July 2019, Mr. Merlo's defense sent me a draft of a motion the defense was considering filing.to enforce the plea agreement allegedly reached orally with

the original AUSA.  On July17, 2019, I sent a copy of it to the original AUSA

and his and my supervisors, as the motion made the original AUSA a possible

fact witness. The next day, the original AUSA sent me an email in which he

stated, "I strongly refute the motion of any oral agreement."

9. On Saturday, September 14, 2019, I sent the original AUSA and our supervisors

an email asking the original AUSA to search the Proofpoint Archive of his

emails for emails with victor@victorsherman.law and forward them to me.

That is the email address of Mr. Sherman, and the Proofpoint Archive has all an

AUSA's emails for the last three years.  On Sunday, September 15, the original

AUSA sent me an email saying that he had done the email search and

forwarded the emails between him and victor@victorsherman.law.  All of the

emails forwarded to me by the original AUSA are attached as Exhibit F, except

for one that dealt with a substantive cooperation issue.


I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED in Atlanta, Georgia, on September 17, 2019.

SANDRA E. STRIPPOLI
ASSISTANT UNITED STATES ATTORNEY

6